IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BRADLEY S. SMITH and ) | |
| JULIE S. MCGEE, et al., ) | |
| ) | CIVIL ACTION NO: |
| Plaintiffs, ) | 1:14-CV-00324 |
| ) | |
| vs. ) | |
| ) | |
| TRIAD OF ALABAMA, LLC, ) | |
| d/b/a FLOWERS HOSPITAL; ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO RECONSIDER
CLASS CERTIFICATION ORDER**

COMES NOW Defendant Triad of Alabama, LLC d/b/a Flowers Hospital ("Flowers" or the "Hospital") and hereby moves this Honorable Court, pursuant to Fed.R.Civ.P. 23(f), to reconsider certain, limited portions of its March 17, 2017 Order [Doc. 78] certifying this case as a class action,[1] including the creation of two subclasses. In particular, Flowers moves this Court for the following relief:

  a. The dates of employment for Kamarian Millender ("Millender"), the former employee convicted of identity theft in connection with this case, are not disputed by the parties, but were misstated in one part of the Court's Order, and certain inferences were drawn by the Court based thereon. Both parties relied heavily upon, and did not

---

[1] Flowers Hospital maintains that Plaintiffs have failed to meet their burden, even for purposes of provisional class certification, that 1,208 reference lab patients' information "was stolen," as set out in the Court's class definition. At best, Plaintiffs have presented evidence from which it could be inferred that the information of 1,208 reference lab patients "may have been stolen." The determination of whether any given reference lab patient's information "was stolen" will require individualized evidence rather than evidence on a classwide basis, with the possible exception of the 56 records found in Millender's possession when he was arrested. If a class it to be maintained, Flowers Hospital requests the Court to amend the class definition to include the 1208 individuals whose information "may have been stolen."

dispute, the testimony heard by the Middle District of Alabama during Millender's sentencing hearing in *U.S. v. Millender*, M.D. Ala. Case No. 2014-CR-00401 (Doc. 9)(submitted herein as Doc. 70-3). Once the sequence of events is corrected, Flowers believes the inferences ascribed to that testimony at pages 18-19 of the March 17, 2017 Order become evident and in need of revision.  Given that Plaintiffs bear the burden of proof as to class certification, Flowers moves this Court to reconsider these findings and the inferences the Court drew therefrom, including the findings and inferences stated as to numerosity and predominance.

b. While the presentation of the evidence by the parties may have been unclear, leading the Court into erroneous conclusions, the distribution of the members of the proposed class of 1208 into an express contract subclass and an implied contract subclass is far from simple, and will lead to administrative and evidentiary issues that will defeat any efficiency to be gained from the creation of such subclasses.  Flowers moves the Court to reconsider the certification of *any* class for breach of contract, whether express or implied, particularly since <u>no evidence</u> shows any of the class of 1208 reference lab patients received a Notice of Privacy Practices ("NPP") in connection with reference lab work.[2]

c. Extending the Court's Order as to implied contract to its logical conclusion essentially imposes upon Defendant Flowers a standard of strict liability, which is

---

[2] Flowers concedes, for purposes of provisional class certification only, that members of the 1,208 could have received Flowers' NPP in connection with inpatient or outpatient treatment, wholly separate from reference lab work at issue in this case.  The Court's March 17, 2017 Order cites Docs. 70-9 at 4-5 and 73-12 at 10 as evidence that Ms. McGee received a Flowers NPP.  However, as Doc. 73-12 at 10 shows, Mrs. McGee could only say she had "maybe" had blood drawn at Flowers' lab, and she did not testify that she received Flowers' NPP on that occasion.  Therefore. Mrs. Hatcher's testimony that reference lab patients do not receive a Flowers NPP is uncontradicted.  (*Doc. 73-1 at 7*).

- 3 -

inconsistent with Alabama law.  Defendant Flowers moves this Honorable Court to reconsider the certification of this case as a class as to Plaintiffs' claim for breach of implied contract.

As an initial matter, Plaintiffs bear the burden of proof as the proponents of class certification.  *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).  "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation.  *Id.*  "A district court that has doubts about whether 'the requirements of Rule 23 have been met should refuse certification until they have been met.'"  *Id. at 1233-34.*  If doubts remain, then Plaintiffs lose.  *Brown*, 817 F.3d at 1233.  In evaluating evidence as to class certification, the court is not to make determinations of credibility.  *See*, *e.g., Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 496 (S.D. Fla. 2003).[3]  The allegations in Plaintiffs' Complaint are not entitled to any presumptions in determining whether a class is to be certified.

Plaintiffs did not undertake discovery to substantiate their allegations.  They did not attempt to depose Millender and did not pursue discovery from federal investigators.  Instead, they merely relied upon Flowers' due diligence investigation and argued inferences from Millender's criminal legal proceedings.  Any gaps in Plaintiffs' evidence or inferences drawn from evidence should be weighed against certification.  *Brown*, 817 F.3d 1225.

---

[3] *See Doc. 78 at 24.*

> **I.        Kamarian Millender Began Employment at Flowers Hospital in June 2013, not June 2012, as Stated at Page 18 of the 03/17/2017 Order, and the Testimony of Millender Submitted By Plaintiffs Supports Inferences Other Than Those Reached by the March 17, 2017 Order.**

At page 18 of Doc. 78, this Court stated that Millender began his employment with Flowers Hospital in June 2012. Though potentially a typographical error, the difference between 2012 and 2013 is significant because of the timeline of when Millender committed tax fraud. The Court's reference to 2012 as the start date of Millender's employment forms the predicate for inferences by the Court which merit correction.

No one disputes that Millender started work at Flowers in June 2013. Plaintiffs submitted to the Court, and relied upon, the plea agreement of Millender in which he admits that his fraudulent conduct started before he even began working at Flowers Hospital and had access to Plaintiffs' information. (*See Doc. 70-3 at 7*). Not referenced in the Court's Order is the fact that Millender admitted he began his fraudulent conduct in January 2013, five months before he had access to reference lab documents as an employee beginning June 2013. [Exhibit C to Plaintiff's Class Certification Motion, *Doc.70-3 at p.7*]. This is significant in how it factors into the timeline set out in Millender's plea hearing, greatly affects Plaintiffs' showing of numerosity, and keeps the issue of causation at the forefront of the question of predominance.[4]

Plaintiffs testified that they found out about fraudulent tax filings by being notified that a return had already been filed for their respective social security numbers when they attempted to file their tax returns. *(Doc. 73-6 at 9 (Whittle); Doc. 73-9 at 19 (Parker); Doc. 73-10 at 22*

---

[4] Equally important regarding predominance and causation is the undisputed fact that many of the reference lab forms supposedly stolen by Millender did not even contain complete social security numbers. (*Doc. 73-1 at 10, 27, and 38; Doc. 73-8 at ¶¶6-8*). In the face of Plaintiffs' own evidence via Millender's plea agreement, admitting his fraudulent conduct started before he even worked at Flowers, and the undisputed testimony that many of the order forms that were missing did not contain social security numbers, Plaintiffs failed to meet their burden that causation can be established on a classwide basis.

*(Hall); and Doc. 73-12 at 10-11 (McGee)).* The inferences to be drawn from that testimony for provisional class certification are that: (1) Plaintiffs abided by the April 15 deadlines each year, and (2) if Millender attempted a fraudulent filing on a social security number of one of the 1,208 reference lab patients (or anyone else) *after* the real return had been filed, then Millender would have received the same message that the Plaintiffs (or any other individual taxpayer would have) received—a return had already been filed.

It stands to reason that in order to be successful in filing fraudulent returns (and obtaining a fraudulent refund), Millender had to file the fraudulent returns before the Plaintiffs filed their real returns — had he attempted to file the fraudulent returns after the real returns were filed, he would have received the message that a return had already been filed and would have been unsuccessful, just as Plaintiffs were unsuccessful in filing their returns when preempted by a fraudulent filing. It is also safe to infer, for present purposes, that Plaintiffs and other tax filers submitted returns by the April 15 deadline, and it goes without saying that a return cannot be filed before the end of the tax year. That leaves a small window between the start of the year and when the taxpayers filed their returns. If Millender does not file first, then he would receive the message that Plaintiffs received when trying to file a return. In short, in order to fraudulently obtain Plaintiffs' refunds, Millender must file and obtain the refund first.

For this reason, the timeline of Millender's activity regarding Flowers reference lab patients is significant given his starting date at Flowers in June 2013 (not 2012) and the plea hearing testimony submitted by both parties. The following timeline is confirmed by the record:

January 2013: Millender begins his fraudulent tax filing scheme. (*Doc. 70-3 at 7*).

April 15, 2013: Filing deadline for tax year 2012. As admitted by Millender in his sentencing testimony, he filed 99 of the 124 fraudulent tax returns for tax year 2012. (*Doc. 70-3*

*at 7*). Logic dictates that Millender filed these fraudulent returns before the actual taxpayers filed, certainly before April 15, 2013, in order to file before the taxpayer and to obtain the taxpayer's refund.

June 2013: Millender starts work at Flowers Hospital.

February 2014: Millender is arrested and fired from Flowers. The most fraudulent returns Millender could have filed while employed by Flowers is 25, barely 2% of the 1,208 individuals who Plaintiffs seek to be included in the class. (*Doc. 70-3 at 7*).

April 15, 2014: Filing deadline for tax year 2013.

The timeline leads to this conclusion: as testified to by Millender and submitted by both parties, most of Millender's fraudulent activity preceded his employment at Flowers, leaving only 25 fraudulent returns he could have filed after stealing information while working at Flowers. Based on the substantial discrepancy between 25 fraudulent returns versus the 1208 member class that Plaintiffs seek to certify, Flowers requests the Court to reconsider the inferences to be drawn from Millender's criminal plea. Because Plaintiffs have the burden of proof, the inferences should be weighed against certification of any class, especially since the correct timeline of events further demonstrates the problems with numerosity and further buttresses how individual inquiries of standing and causation predominate.

II. **Dividing the 1,208 into Express Contract and Implied Contract Sub-Classes Creates Administrative Impediments to the Efficient Handling of This Case as a Class Action.**

In summary, the March 17, 2017 Order divides the 1,208 into two subclasses based upon whether the individual received or did not receive a Flowers Hospital Notice of Privacy Practice ("NPP"). (*Doc. 78 at 45*). Flowers agrees with the distinction made by the Court regarding the

differences in the presentation of evidence and law for claims of breach of express contracts versus breach of implied contracts. Nevertheless, establishing these two subclasses further highlights the individualized evidence required to resolve these contract claims. Flowers requests the Court reconsider its Order certifying either of the breach of contract claims due to the individualized evidence that will be required in order to evaluate contract formation issues and properly sort the class members into the two subclasses.

The elements of a claim for breach of a contract implied in fact are the same as a claim for breach of an express contract. *Welborn v. Snider*, 431 So. 2d 1198, 1200 (Ala. 1983); *Ellis v. City of Birmingham*, 576 So. 2d 156, 157 (Ala. 1991); *Jianjun Fu v. Wells Fargo Home Mortg.*, 2014 WL 4681543, *5 (N.D. Ala. Sept. 12, 2014); *Hancock-Hazlett Gen. Const. Co., Inc. v. Trane Co.*, 499 So. 2d 1385 (Ala. 1986)(affirming dismissal of a complaint alleging breach of implied contract because of a lack of offer and acceptance). However, the need for individualized treatment arises from the differences in the method of proving the manifestation of mutual assent, or meeting of the minds. *Welborn*, 431 So. 2d at 1200; *Ellis*, 576 So. 2d at 157; *Compass Bank v. Snow*, 823 So. 2d 667, 676-78 (Ala. 2001). "'An implied contract arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract.'" *Jianjun Fu*, 2014 WL 4681543 at *5. In an implied contract case, the overt expression of agreement is missing, and Plaintiffs must prove an intent to contract through implication arising from the parties' conduct. *See, e.g., Ellis*, 576 So. 2d at 157 ("There is no evidence in the record indicating that the parties intended to become contractually bound…there was no evidence of any agreement or bargained-for exchange between Ellis and the defendants."); *Jewett v. Boihem*, 23 So. 3d 658, 661 (Ala. 2009)("…in cases of express contracts and contracts implied in fact, the intention is of the essence of the

transaction.")(*quoting* Jenelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages §
34:2* (5th ed. 2004)); *Jianjun Fu*, 2014 WL 4681543 at *5 ("Unfortunately for Qin and Fu, their
communications with Wells Fargo were limited to the creation of the loan, and do not expressly
or implicitly discuss any of the alleged contractual terms Qin and Fu assert."). Similarly, "an
implied-in-fact contract arises where all of the circumstances surrounding the transaction,
including the prior relationship and the former course of dealing of the parties, and the 'common
understanding of men, show a mutual intent to contract.'" *Leisure American Resorts, Inc. v.
Carbine Const. Co., Inc.*, 577 So. 2d 409, 413 (Ala. 1990).

  Plaintiffs chose the theory of predicating the breach of an express contract action on the
NPP. As it turns out, the evidence is uncontested that reference lab patients do not receive a
Flowers NPP if they do not come to Flowers for their labwork. *See n.2, supra*. A "reference lab
patient," by definition, is a patient who does not come to Flowers to have their lab work done.
*Id.* Rather, reference lab patients have their samples taken at an outside office and the requesting
physician sends them to Flowers to be tested. *Doc. 73-1 at 7*. In fact, some Plaintiffs did not
even know that Flowers would be providing testing services for the lab work ordered by their
physicians. *See, e.g., Doc. 73-6 at 8-9.*[5] It would appear, therefore, that no reference lab patient
will be in the express contract subclass by reason of their reference lab work.

  The problems do not end there, however. An examination of the evidence set forth so far
in the class certification proceedings reveals that the express versus implied contract
determination is still not possible without further examination of the facts and applicable law.
Other issues must still be addressed in order to sort the 1,208 into the two proposed subclasses.
If at some point a reference lab patient was an inpatient or outpatient of Flowers, and did receive

---

[5] In contrast, Plaintiff Parker testified that he knew Flowers had provided lab services. *Doc. 73-9 at 12*.

a Flowers' NPP in connection with that treatment, would that person be in the express contract subclass because they received that Flowers NPP in connection with other treatment? Would a Flowers NPP received in connection with inpatient or outpatient admission extend to prior or subsequent unrelated reference lab work?  If so, for what period of time? Would seeing the Flowers NPP' on Flowers Hospital's website, then proceeding with reference lab work make one of the 1,208 a member of the express contract subclass?  (Or, alternatively, would that manifest intent, sufficient for the implied sub-contract class)?   The number of factual variables to consider, along with the law pertaining to the required proof of meeting of the minds, makes administration of an express contract subclass unworkable.  Therefore, a division of the 1,208 reference lab patients into express and implied contract subclasses still involves too many individual questions for Plaintiffs to meet their burden as to predominance and superiority.

The relationship between the reference lab patients and Flowers is even more difficult to resolve on a classwide basis for an implied contract theory.  The formation of an implied contract comes down to the manifestation of intent, based on the circumstances and actions of the parties. *Snow*, 823 So. 2d at 676-77; *Leisure American Resorts*, 577 So. 2d at 413.  Because there is no clear, unified assent in the implied contract being alleged in this case, whether there was a meeting of the minds will require an analysis of the circumstances of each individual reference lab patient.  *See generally Bishop's Property & Investments, LLC v. Protective Life Ins. Co.*, 255 F.R.D. 619 (M.D. Ga. 2009)("Implying contractual duties upon parties who neglected to spell out those duties in their written contracts typically requires a uniquely individual analysis on a case-by-case basis").[6]

---

[6] Indeed, Alabama law historically requires privity between the parties in a claim of breach of implied contract.  *See* Jenelle Mims Marsh *Alabama Law of Damages § 32:6* (6th ed.).  Given the general lack of privity between reference lab patients who did not even know Flowers Hospital would be involved in

Again, reference lab patients did not go to Flowers Hospital for the lab testing. Instead, they interacted with any number of doctor's offices and clinics in the Dothan area. As demonstrated by the testimony of Jack Whittle (*Doc. 73-6 at 8-9*), reference lab patients did not even necessarily know that Flowers was going to be involved in the testing of their medical samples. Indeed, with no interaction between the Hospital and the patient, Plaintiffs cannot show any communication between them from which to infer implied contract terms regarding information security or even any basis for a relationship, much less a doctor/patient relationship.

A situation in which a patient selects a doctor and confides in that doctor is one thing; it is a different situation entirely if, as is undisputedly the case here, the patients did not select, much less decide to confide in, Flowers Hospital for reference lab services at all. Resolving the nature of the parties' relationship on a classwide basis, where many of the plaintiffs undisputedly did not even know Flowers Hospital was involved, while at least one named Plaintiff, Adam Parker, did know Flowers' role, demonstrates that individual evidence will be necessary in establishing the nature of their relationship. Similar to the myriad individual facts affecting an express contract subclass, numerous individual facts affect manifestation of intent in an implied contract subclass. For example: whether the reference lab patient even knew Flowers was performing the testing; whether the patient had received a Flowers NPP on another occasion as an inpatient or outpatient; whether the reference lab patient had received the referring physician's NPP instead of the Hospital's NPP; and so on.

---

testing their specimens, uniform classwide evidence cannot possibly establish the necessary privity of contract element between reference lab patients and Flowers on an implied contract theory. *See Oswalt v. U.S.*, 41 Fed. Appx. 471, 473 (Fed. Cir. 2002); *Tecorp Entertainment v. Romanow*, 238 F.3d 424 (6th Cir. 2000)("An implied contract cannot come into existence unless the parties sustain contract relations. In other words, the parties must share 'that connection, mutuality of will and interaction…generally expressed…by the term privity.'")(*quoting Woods v. Ayres*, 39 Mich. 345, 350 (1878)).

The Court states that each member of the putative class can prove a doctor patient relationship with Flowers "by offering the same evidence, namely, their registration as a Flowers patient." (*Doc. 78 at 31*). However, as reference lab patients, the putative class members did not come to the hospital for lab work and often did not know that Flowers was performing the work ordered by their various doctors in the first place. While the doctor/patient relationship can certainly be said to be unique in some ways, it would truly be unique to be able to prove such a relationship when the patient does not even know the "doctor" is involved in the relationship at all. The patients undisputedly selected their doctors, went to see their doctors, interacted with their doctors, and in the course of doing so, their doctors sent medical samples to Flowers, often without the patients even knowing Flowers was to be involved. Plaintiffs cannot dispute this because Plaintiff Whittle testified this situation was the situation he experienced. (*See Doc. 73-6 at 8-9*).

### III. Among Other Problems, the Lack of Definition of the Implied Contract Subclass Ultimately Results in a Theory of Strict Liability and is Therefore Improper as Being Contrary to Alabama Law.

The certification of an implied contract claim not only requires individualized analysis as to contract formation issues, but it also requires an individualized analysis as to what terms are to be implied in the agreement, namely to what degree did Flowers impliedly agree to protect the reference lab patients' records from theft. At page 30 of this Court's Order (*Doc. 78*), the Court essentially reduces the class issues as to breach of implied contract down to questions of "relationship and disclosure." However, this view oversimplifies Alabama law as to formation of an implied contract and in light of the cases cited in the Order, would ultimately impose strict liability upon Flowers for any breach of data.

All of the cases cited by Plaintiffs and by the Order regarding the formation of a doctor/patient relationship in the context of disclosure of confidential information involve a conscious decision—a voluntary act for compensation—by the doctor to disclose patient information. (*See Doc. 69 at 14-15*). However, two problems arise from inferring a doctor/patient relationship between reference lab patients and Flowers. First, it is undisputed that many reference lab patients had absolutely no contact with Flowers. The patients had contact (and, therefore, a doctor/patient relationship) with an outlying physician, and Flowers was essentially a subcontractor performing lab testing for that physician. No case has been presented that holds Flowers is in a doctor/patient relationship with reference lab patients who did not even know Flowers performed their lab work, as was testified to by Plaintiff Whittle. (*Doc. 73-6 at 8-9*).

Second, in the present case, the disclosure of information was not through a conscious, voluntary decision by the hospital, as was the issue in the cases cited by Plaintiffs. Rather, the disclosure was the criminal act of an employee. To impose this same standard upon Flowers in a case in which information was stolen rather than voluntarily disclosed for compensation by the doctors ultimately makes Flowers a guarantor of information security, by implied contract. Nowhere is this implication supported by either the evidence or by Alabama law. In fact, given that Alabama law states that an implied contract "rests on consent, and it is to every intent and purpose an agreement between the parties," an implied contract cannot exist under Alabama law in these circumstances unless the elements of a contract are is shown. *Water Works and Sanitary Sewer Bd. of City of Montgomery v. Norman*, 208 So. 2d 788, 791 (Ala. 1968). Indeed, if a Plaintiff did not know Flowers was providing lab services, then the necessary consent, an agreement between the parties, and "a contract status" cannot exist.

While neither the law nor the facts supports imposition of a strict liability standard with respect to the theft of information, such a standard necessarily would mean that the issues of liability under the implied contract claim (since effectively decided) do not predominate over the outstanding issues of causation and damages, making class certification improper.  However, even if a different standard of liability is applied, the implied contract claim cannot be resolved on a class basis. As mentioned, the issue of whether a breach of an implied contract occurred would depend upon the manifestation of intent of the parties.  Whether the reference lab patient had an understanding that the entity that tested their lab specimen would be a guarantor of that information or whether the patient had an understanding that the lab entity would use a reasonableness standard requires an individual analysis, one that is inappropriate for class treatment.

WHEREFORE, premises considered, Flowers hereby requests of this Honorable Court the following relief:

a. Find that, for purposes of provisional class certification, Kamarian Millender began his employment with Flowers Hospital in June 2013 rather than June 2012, and draw appropriate inferences therefrom, including:

   (1) Without dispute by the parties, and as testified to in Millender's plea hearing in *U.S. v. Millender*, M.D. Ala. Case No. 2014-CR-00401 (Doc. 9), Millender commenced his identity theft in January 2013, before he began his employment at Flowers Hospital;

   (2) That members of the 1,208 likely filed their 2012 tax returns before the April 15, 2013, deadline;

   (3) That in order for Millender to succeed in filing a fraudulent tax return, he had to do so before the actual taxpayer filed, otherwise Millender's filing would have been denied due to a return already having been filed, as the Plaintiffs claim happened to them when they tried to file their returns;

   (4) Accordingly, without dispute by the parties and as testified to in Millender's plea hearing in *U.S. v. Millender*, M.D. Ala. Case No. 2014-CR-00401 (Doc. 9), the number of fraudulent tax returns filed by Millender after he commenced employment at Flowers was no more than 25;

    b. Plaintiffs have failed to present sufficient evidence to establish, for purposes of provisional class certification, that:

        (1) Any reference lab patient who did not have medical specimens obtained at Flowers Hospital received a Notice of Privacy Practices from Flowers Hospital and therefore cannot be in a breach of express contract subclass; and

        (2) Certification of a breach of implied contract subclass is appropriate due to a lack of uniform, classwide evidence establishing the terms of an implied contract or establishing mutual assent to terms of an implied contract;

    c. The determination of a breach of implied contract on a class basis has not been established due to the lack of evidence that Flowers Hospital, as opposed to the criminal act of a third party, was the result of any voluntary disclosure for profit in violation of any term of an implied contract;

    d. Such other or additional relief as may be fair and just.

Respectfully submitted,

*/s/ Richard E. Smith*
Richard E. Smith (ASB-6536-M69R)
Jonathan W. Macklem (ASB-9089-H64M)
J. Paul Zimmerman (ASB-8707-I53J)
Attorneys for Defendant, Triad of Alabama LLC,
d/b/a Flowers Hospital

**OF COUNSEL:**
CHRISTIAN & SMALL LLP
505 20th Street North
Suite 1800 Financial Center
Birmingham, AL  35203
Telephone: (205) 795-6588
resmith@csattorneys.com
jwmacklem@csattorneys.com
jpzimmerman@csattorneys.com

- 15 -

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this date, using the CM/ECF filing system which will send notification of such filing, served a copy of the foregoing pleading upon all counsel of record on March 31, 2017:

M. Adam Jones
Jordan S. Davis
M. Adam Jones & Associates, LLC
206 N. Lena St.
Dothan, AL  36303-4429
adam@AdamJonesLaw.com
jordan@AdamJonesLaw.com

James M. Terrell
MCCALLUM, METHVIN & TERRELL, P.C.
2201 Arlington Avenue South
Birmingham, AL 35205
jterrell@mmlaw.net

                                  */s/Richard E. Smith*
                                   OF COUNSEL